COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-454-CV

 

 

IN THE INTEREST OF S.R.,                                            

J.R.,
AND B.R.,

CHILDREN                                                                                          

 

                                                                                                        

                                              ------------

 

              FROM
THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Introduction

Appellant Heather R. appeals
the trial court=s order
terminating her parental rights to her children, S.R. (Sarah), J.R. (Josh), and
B.R.(Becca).[2]  In two points, appellant argues that the
evidence is legally and factually insufficient to support the trial court=s best interest finding.  We
affirm.








Background Facts








On March 17, 2006, Kevin
Campbell, an investigator with the Texas Department of Family and Protective
Services (TDFPS) in Wise County, received an allegation of neglectful
supervision, physical abuse, and sexual abuse of appellant=s children, ten-year-old Sarah, six-year-old Josh, and five-year-old
Becca.[3]  Campbell also received information that the
house was roach-infested and that the children were living in deplorable
conditions.  Campbell visited appellant=s home, which was a trailer located on Lot A in Newark, Texas, and
observed roaches crawling on the floor, inside containers in the kitchen, in
the frying pan, in the refrigerator=s egg tray, in the bedding, and on the walls.  Campbell also noticed that an extension cord
ran from the trailer house to another trailer house to provide electricity and
that there was only enough electricity for the television.  The trailer was lit by candles in the living
room.  Additionally, the water pressure
was nonexistent, and the hot water heater was not functioning.  The toilets were unsanitary and could not be
flushed because of the lack of water. 
Unwashed dishes were stacked in the kitchen, and Campbell could tell
that they had been sitting for a long time. 
He also observed trash piled up in the kitchen.  The floor contained numerous holes, which
were covered with large road signs. 

TDFPS removed Sarah, Josh,
and Becca and told appellant that she needed to clean her home so that it would
be a safe environment for her children. 
Appellant complied, and TDFPS returned her children around August
2006.  However, a few weeks later in September
2006, TDFPS removed the children for a second time after appellant left them
with relatives, Tiffany Taylor and Amber Spivey, because TDFPS believed that
appellant had abandoned them and because they were living in similar, unsafe
conditions as before.  While in Taylor
and Spivey=s care, the
children lived in a ten-by-ten shed with one couch, no running water, and a
nonfunctional toilet; there was also a strong urine smell.  Taylor and Spivey told TDFPS caseworker
Stephanie Flavin that appellant was not helping them financially. 








Flavin, who received
appellant=s case in
mid-September 2006, testified that the children were placed in foster care
until November and then went to live with appellant=s brother and sister-in-law, Heath and Sheila.  Sheila testified that appellant steadily
visited the children for a while but then her visits became more sporadic.  She stated that the interaction between
appellant and her children was always positive, and the kids were happy to see
her.  Sheila thought that the visits were
appropriate and that appellant seemed attentive and affectionate.  In fact, appellant called almost every
night.  The children were with Heath and
Sheila until April 2007 when Sheila had to return the children to TDFPS because
they could not financially take care of them. 
Sheila testified that she was willing to let the children live with her
and be their guardian, but she could not accept full financial responsibility
for them.  Sheila also testified that she
and her husband could not afford medical and child care for their own four
children plus three more.  Sheila stated
that appellant did not financially assist Heath and Sheila although she did
provide things such as clothing and toiletries as needed.  Sheila testified that she did not believe it
was in the children=s best
interest to have appellant=s parental rights terminated. 
After Sheila returned the children, TDFPS placed them in foster care. 








TDFPS gave appellant a
service plan, which included two types of parenting classes, individual
counseling, a psychological evaluation, and drug testing.  TDFPS required appellant to attend a
parenting class on nutrition and cleanliness and a parenting class at the
Family Guidance Center; appellant attended only the parenting class at the
Family Guidance Center.  She claimed she
could not attend the nutrition and cleanliness class because of her work
schedule.  Additionally, appellant did
not complete counseling because of her work schedule although Flavin set up
counseling services for appellant in Fort Worth.  Flavin made appointments with appellant to
visit her residence in Newark, which was a different trailer on the same
property located on Lot B, but appellant usually canceled because of her work
schedule.  Each time Flavin visited the
residence, appellant was not there.  In
November 2006, appellant informed Flavin that she was not living on Lot B at
the Newark address but instead was living with various friends.  The last time Flavin visited appellant=s residence, the trash pile which TDFPS requested that appellant
remove had gained in height; there were abandoned vehicles, car parts, an
engine, a boat, an old mattress, and other items such as tin in the yard that
could injure or cut the children. 

TDFPS also required appellant
to turn in documentation regarding her employment; however, Flavin testified
that appellant never provided any pay stubs or paperwork.  Additionally, TDFPS also required appellant
to be randomly drug tested, and appellant submitted to two tests, which were
negative.  However, appellant did not
show up for any more drug tests.  In
addition to completing one of the required parenting classes, appellant
completed a psychological evaluation in January 2007.  TDFPS set up visitation for appellant on
Sundays, but she would often show up late or leave early.  Flavin testified that appellant=s interaction with the children during visitation was minimal.  








Mary Graves, a therapist with
Catholic Charities, had been seeing the children since April 2007 when they
were referred for adjustment issues. 
Graves testified that all of the children said their home was not in
good shape.  Sarah was left alone with
the little ones, which scared her, and she was terrified of returning to that
environment.  Graves testified that Sarah
had self-esteem issues because she was in a lower grade as a result of missing
so much school.  Graves also said Sarah
had a habit of parenting the little ones. 
Sarah craved structure and security, and she did not want the responsibility
of caring for her younger siblings. 
However, Sarah was progressing well and happier with herself.  

Graves testified that when
she first saw Josh, he was very shy, rarely smiled, and sad.  He had serious sleep problems and was anxious
and scared a lot.  He was also abrasive
towards his sister Becca.  Additionally,
Josh would have meltdowns and become Aunglued@ by kicking,
hitting, and biting; he would also hold and smear feces.  Graves had talked to him about his anger and
how to manage it so that he did not get in trouble or hurt himself or
others.  She testified that his meltdowns
could sometimes be avoided.








Graves testified that Becca
was a Acutie@ and
wonderful to talk to; however, Becca whined and tried to get her own way.  Graves also said that Becca tried to get Josh
in trouble.  Graves stated that Becca was
oppositional and defiant; she did not want to obey and threw things while
kicking and screaming.  Becca also held
and smeared feces.  Additionally, Becca
did not like to sleep.  Becca had also
acted out sexually; for example, she exposed herself to her brothers and other
boys.  Graves testified that Becca had
learned to accept Ano@ and worked on understanding boundaries.  Graves had also talked with Becca about body
safety.  Graves testified that the type
of living conditions the children experienced amounted to abusive and
neglectful conduct, and she believed that it was not in their best interest to
return to appellant.

At trial, appellant testified
that she did not abandon her children but that she worked late and left them
with her family because she did not want to disrupt their sleeping routine and
school schedule.  Appellant testified
that she left her children with her family during the week but would pick them
up on the weekends.  She never intended
her children to stay there on a permanent basis. She also testified that she
provided for her children by giving Taylor and Spivey diapers, wipes, food,
clothing, gas money, or whatever they needed. 
After TDFPS removed her children for the second time, appellant stated
that she attended visits although she missed a couple of times because of work.
Appellant testified that she was bonded with her children. 








Additionally, appellant
testified that she participated in drug tests and that she never tested
positive.  Appellant stated that she had
not complied with the counseling requirement because of paperwork issues.  She testified that she completed parenting classes.  Appellant also testified that she worked at
Popeye=s, but she did not provide Flavin with any check stubs.  

Appellant testified that she
was willing to leave her current residence if her children could live with her
sister Crystal Mendoza.  She and Mendoza
lived on the same property, but in different trailers.  She and Mendoza switched trailers after
appellant=s children
were removed so that, at the time of trial, Mendoza lived in the trailer that
TDFPS determined was an unsafe environment at the time of removal.  Appellant testified that if she got her
children back, they would stay with Mendoza, who had a clean home with ample
room.  The trailer had been painted, had
new carpet installed, and had been sprayed for bugs, and the holes in the floor
had been repaired. 

Mendoza also testified that
she and her husband had renovated the trailer. 
The trailer had electricity and running water with working toilets.  She also testified that she was willing to
let appellant and her children live with them for as long as was
necessary.  Although there would be seven
children and three adults, she also stated that there was adequate space. 








Adrienne Shabazz, a
licensed social worker who did kinship studies for TDFPS, testified that the
property on which appellant lived contained two or three trailers.  Shabazz completed a home study on Mendoza
because she offered to take Sarah, Josh, and Becca.  Shabazz testified that Mendoza=s trailer, which was the trailer the children had been living in when
they were removed, was very small and sparsely furnished.  The trailer had three bedrooms for seven
children and three adults.  Shabazz was
concerned because appellant lived on the property, and thus she was in close
proximity to the children.  Shabazz was
also concerned because while she was there, one of Mendoza=s children was out of control; Mendoza also told Shabazz that she had
never taken one of her children to the doctor. 
Although the home was tidy, Shabazz saw roaches crawling around, but she
did not see any holes in the floor or trash piled up.  Although nothing about the home was Aglaringly dangerous,@ Shabazz believed the trailer was not an appropriate home for the
children because it was too small, appellant resided too close by, and Mendoza
could not control her own children. 

In addition, appellant
testified that her mistakes had traumatized her children but that she wanted to
make up for her wrong decisions. 
Appellant said that she regretted her mistakes and that she had changed
her way of thinking.  Appellant stated
that she attended church and had the support of family and friends.  Appellant also testified that she had not
used drugs, had never been convicted of a crime, and had never abused her
children. 








After a bench trial on
December 6, 2007, the trial court determined that appellant (1) knowingly
placed or knowingly allowed her children to remain in conditions which
endangered their physical and emotional well-being, (2) that she failed to
comply with the provisions of the court order which were necessary for her to
obtain the return of her children, and (3) that termination was in their best
interest.[4]
[CR 19] See Tex. Fam. Code Ann.
'' 161.001(1)(D), (O), (2) (Vernon Supp. 2007).  Appellant timely filed this appeal. 

Standard of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be sacrificed
merely to preserve that right.  In re
C.H., 89 S.W.3d 17, 26 (Tex. 2002). 
In a termination case, the State seeks not just to limit parental rights
but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20B21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

A. Legal Sufficiency

In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the fact-finder resolved any
disputed facts in favor of its finding if a reasonable fact-finder could have
done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.








We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.

B. Factual Sufficiency

In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.  If we reverse on
factual sufficiency grounds, then we must detail in our opinion why we have
concluded that a reasonable fact-finder could not have credited disputed
evidence in favor of its finding.  J.F.C.,
96 S.W.3d at 266-67.

Applicable Law








Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Analysis

A.     Desires
of the children

At the time of trial, Sarah
was ten years old, Josh was six years old, and Becca was five years old.  Therapist Graves testified that Sarah had
taken on the parenting role to her younger brother and sister because she had
been left alone with them.  Graves also
testified that Sarah was terrified that if they went back with appellant, she
would be left alone with her siblings again. 
Sarah=s aunt
Sheila, however, testified that Sarah wanted things back the way they wereCback to normal.  Sheila also
stated that Sarah wanted her mother and father. 
Becca would also tell Sheila, AI want to go home . . .  [w]hen do I get to go
home?@  Sheila testified that the
children loved appellant and that they were bonded.  

B.     The emotional and physical needs of the
children now and in the future, and the emotional and physical danger to the
children now and in the future

 








The evidence shows that
appellant=s home was
an unsafe, unhealthy environment and that appellant had frequent changes of
residences and multiple jobs.  Appellant
admitted that her home on Lot A in Newark was unsafe because it was infested
with cockroaches and dirty; she stated that her children, at that time, were
living in an endangering situation. 
Appellant also admitted that leaving her children with Taylor and Spivey
was inappropriate because the space was too small.  Appellant testified that, at the time of
trial, she did not have stable housing, but she also testified that she lived
on Lot B after switching trailers with her sister.  Appellant stated that she had been living
there about a month, but had not unpacked and that she often slept at friends= homes.  Flavin testified that
the exterior of appellant=s current
residence on Lot B, which Flavin was never able to inspect because appellant
did not keep any of her appointments, had worsened in condition with many
objects scattered in the yard that would be dangerous to the children. 

Appellant testified that, at
the time of trial, she had been working at Popeye=s for three to four months. 
Before that she was employed at Ryder, D&B Entertainment, and
Michael=s.  However, the only
verification Flavin received regarding appellant=s employment was from Michael=s.  The evidence also shows that
appellant never provided financial support for her children while they were in
foster care or living with relatives. 
However, appellant did provide clothing or other supplies that the
children needed. 








The record reflects that appellant=s sister, Mendoza, who lived in appellant=s old home on Lot A, had renovated the trailer and offered to allow
appellant and the children to live with her family.  However, TDFPS believed that Mendoza=s home, although not Aglaringly dangerous,@ would not be suitable for an additional three children and another
adult.  TDFPS did not believe that seven
children and three adults could adequately live in a three bedroom
trailer.  

The evidence also
demonstrates that Sarah, Josh, and Becca had emotional problems.  Sarah had self-esteem issues and feared
returning to the same living conditions where she would have to parent her
siblings.  Josh had meltdowns, which
included kicking, hitting, biting, and smearing feces.  Becca also had tantrums and smeared
feces.  Becca told Graves that she wanted
to provoke an adult into biting her because that would make her feel
better.  Becca had also sexually acted
out, and therapy reports indicated that the children had made outcry statements
to family members although TDFPS had been unable to pinpoint a specific person
that may have been abusive.  Graves also
testified that Sarah had witnessed a lot of sexual behavior. 

C.     The parental abilities of the individuals
seeking custody, and the programs available to assist these
individuals to promote the best interest of the children

 








The evidence demonstrates
that appellant did not sufficiently work her service plan.  Appellant attended one of the two required
parenting classes, completed the psychological evaluation, and submitted to two
drug tests. However, appellant did not attend the parenting class on nutrition
and cleanliness, did not complete counseling, did not meet with Flavin for a
home inspection, did not provide employment documentation, and did not show up
for additional drug tests. 
Appellant  told Flavin that she
was unable to participate in or complete many of her services because of her
work schedule.  However, appellant never
provided Flavin with documentation to verify her reasons for not participating
in many of her services. 

Flavin testified that appellant
sporadically visited the children, and when she did visit, interaction with her
children was minimal.  For example,
appellant would ask Sarah to take the younger children to the restroom, and
appellant did not bring food during visitation as requested by TDFPS.  CASA worker Michele Duncan testified that
appellant did not play with the children although she did ask how they were
doing. 

Although appellant completed
some of her services, Flavin and Duncan recommended that appellant=s parental rights be terminated because of appellant=s lack of progress, missed opportunities to visit with her children,
minimal interaction with her children at visitations, and her failure to complete
all of the requested services. 
Furthermore, the children needed a permanent home with stability and
security. 

 








D.     The plans for the children by these
individuals or by the agency seeking custody, and the stability of the home or
proposed placement

 

TDFPS offered no evidence
regarding future plans for the children.

Appellant sought to have the
children placed with her sister Mendoza, who lived in appellant=s old trailer, which had been renovated.  TDFPS had concern over appellant=s close proximity to the children because she lived in another trailer
on the property.  However, appellant
testified that she would move off the property if that allowed the children to
be placed with Mendoza. 

E.     The acts or omissions of the parent which
may indicate that the existing parent-child relationship is not a proper one,
and any excuse for the acts or omissions of appellant

 

As for the parent-child
relationship, there is evidence that Sarah had taken on the parenting role to
her two younger siblings. 

In sum, the record
demonstrates that although appellant participated in some of her services,
appellant=s failure to
complete her services and maintain appropriate housing, and her sporadic visits
with her children, all demonstrate that it was in Sarah=s, Josh=s, and Becca=s best interests that appellant=s parental rights be terminated. 
See Tex. Fam. Code Ann.
' 161.001(2). 








Viewing all the evidence in
the light most favorable to the judgment, we hold that the evidence is legally
sufficient to support the trial court=s finding that termination of appellant=s parental rights was in the children=s best interest.  See id.  Viewing the same evidence in a neutral light,
we hold that it is also factually sufficient to support the trial court=s findings that termination of appellant=s parental rights was in the children=s best interest.  See id.  We overrule appellant=s two points.

Conclusion

Having overruled all of
appellant=s points, we
affirm the trial court=s judgment
terminating appellant=s parental
rights.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL F:    CAYCE, C.J.; LIVINGSTON, and DAUPHINOT, JJ.

 

DELIVERED:
June 5, 2008

 

 

 











[1]See Tex. R. App. P. 47.4.





[2]We
are using fictitious names in accordance with proposed Tex. R. App. P. 9.8, 71 Tex.
B.J. 287B88
(Tex. 2008, scheduled to take effect Sept. 1, 2008).





[3]Appellant
had another child, twelve-year-old T.J., who lived with his father, Thomas R.,
and then with appellant=s
sister, Crystal Mendoza.  Appellant had
previously signed over guardianship of T.J. to Mendoza. 





[4]At
trial, Thomas executed an affidavit of relinquishment of his parental rights to
Sarah, Josh, and Becca.  He did not
appeal the trial court=s
order.